# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------------X

BRUCE HALLETT,                                                    Case No.

                 Plaintiff,

     vs.                                                     <u>**COMPLAINT**</u>

                                        **Jury Trial Demanded**

STUART DEAN CO., INC., ADRIENE BAILEY,
individually, THOMAS BROWN, individually,
MARGARET CULLEN, individually, SCOTT DAY,
individually, CHRIS DEGAN, individually,
CATHLEEN DEGAN-NIKAS, individually,
SCOTT HALSTEAD, individually, TIMOTHY SHEA,
individually, and KRISTEN SCHORP, individually,

                 Defendants.

-------------------------------------------------------------------------X

       Plaintiff Bruce Hallett ("Hallett"), by and through his undersigned attorneys, for his Complaint against Defendants Stuart Dean Co., Inc. ("Stuart Dean" or the "Company") and its Board of Directors (collectively, "Defendants"), alleges as follows:

<u>**INTRODUCTION**</u>

       1.     This dispute arises from Defendant Stuart Dean's breaches of an Employment Agreement with Plaintiff Hallett, as well as other wrongful acts maliciously engaged in by the Company and its Board during the course and scope of Hallett's employment and subsequent termination.

       2.     As set forth below, on or about March 12, 2018, Hallett was hired by Stuart Dean as President and CEO to, among other things, find and generate the interest of an investor.

       3.     Hallett's Employment Agreement provided that his compensation would consist of a base salary, annual performance bonuses, benefits as well as a Long Term Incentive Plan (LTIP).

1

4.     Throughout his employment with Stuart Dean, Hallett provided the services for which he was contracted, including exploring the sale of the Company to outside investors. On or about March 11, 2020, the Board received an Indication of Interest (IOI) letter, placing a $37M to 47M valuation on the Company.

5.     Notwithstanding his success and other achievements, the Company abruptly terminated Hallett on March 8, 2020; at first giving no reason, then claiming his termination was due to "unapproved and prohibited negotiations with a potential business partner;" to then maintaining that the Company was nonetheless willing to construe his termination *without cause*.

6.     The wavering of reasons offered by the Company for Hallett's termination shows the pretextual nature of his ouster. At least two Board members were personally informed by Hallett that informal discussions were ongoing with a specific, unnamed party. The entire Board was aware that management had been approached by outside parties exploring a potential purchase.  If the discussions were truly prohibited, then the Board members were required to inform Hallett of such in writing pursuant to the Employment Agreement. They did not.

7.     The Board and the Company fabricated a record of "willful misconduct" to justify terminating Hallett for cause in order to facilitate the sale of the Company and escape from its obligations to pay the bonus and other compensation to which he is entitled under the Employment Agreement.

8.     Despite having an obligation to do so, the Board failed to enter into a viable LTIP during Hallett's two years as CEO, showcasing their bad faith. The failure to deliver the promised LTIP deprived Hallett of millions of dollars in compensation.

9.     Accordingly, Hallett brings this action against Stuart Dean to recover compensation rightfully owed to him as a result of the foregoing breaches and violations, including, but not limited to, severance, benefits and unpaid incentive compensation owed to Hallett in an amount to be proven at trial, together with statutory and liquidated damages in an equal amount and attorneys' fees pursuant to New York Labor Law, as well as damages in an amount to be determined at trial resulting from Stuart Dean's malicious and willful defamation of Hallett's reputation.

2

10.    Hallett also seeks an award of punitive damages to deter and punish Stuart Dean for its brazen abuse of and disregard for contractual rights, employer statutory obligations, and the fundamental right of every employee in New York to work hard, get paid as agreed, and then if necessary, move on in the workplace free from defamation.

## THE PARTIES

11.    Plaintiff Bruce Hallett is a citizen and resident of the State of Vermont.

12.    Defendant Stuart Dean Co., Inc. is a New York corporation with its principal place of business at 450 Seventh Avenue, 38th Floor, New York, New York 10123.

13.    Defendant Timothy Shea is and was at all times the Chairman of Stuart Dean's Board of Directors. At all relevant times, Chairman Shea exercised control over the managerial operations of Stuart Dean, including the policies and procedures related to hiring and firing employees and determining the rate and method of payment. Upon information and belief, Shea resides in the State of New Jersey.

14.    Defendant Scott Halstead is and was at all times the Chairman of Stuart Dean's Compensation Committee, and a member of the Board of Directors. At all relevant times, Halstead exercised control over the managerial operations of Stuart Dean, including the policies and procedures related to hiring and firing employees and determining the rate and method of payment. Upon information and belief, Halstead resides in the State of California.

15.    Defendant Adriene Bailey is and was at all times a member of Stuart Dean's Board of Directors. At all relevant times, Bailey exercised control over the managerial operations of Stuart Dean, including the policies and procedures related to hiring and firing employees and determining the rate and method of payment. Upon information and belief, Bailey resides in the State of North Carolina.

16.    Defendant Thomas Brown is and was at all times a member of Stuart Dean's Board of Directors. At all relevant times, Brown exercised control over the managerial operations of Stuart Dean, including the policies and procedures related to hiring and firing employees and

3

determining the rate and method of payment. Upon information and belief, Brown resides in the State of New York.

17. Defendant Margaret (Peggy) Cullen is and was at all times a member of Stuart Dean's Board of Directors. At all relevant times, Cullen exercised control over the managerial operations of Stuart Dean, including the policies and procedures related to hiring and firing employees and determining the rate and method of payment. Upon information and belief, Cullen resides in the State of New York.

18. Defendant Scott Day is and was at all times a member of Stuart Dean's Board of Directors. At all relevant times, Day exercised control over the managerial operations of Stuart Dean, including the policies and procedures related to hiring and firing employees and determining the rate and method of payment. Upon information and belief, Brown resides in the State of Georgia.

19. Defendant Chris Degan is and was at all times a member of Stuart Dean's Board of Directors. At all relevant times, Degan exercised control over the managerial operations of Stuart Dean, including the policies and procedures related to hiring and firing employees and determining the rate and method of payment. Upon information and belief, Degan resides in the State of Texas.

20. Defendant Cathleen Degan-Nikas is and was at all times a member of Stuart Dean's Board of Directors. At all relevant times, Degan-Nikas exercised control over the managerial operations of Stuart Dean, including the policies and procedures related to hiring and firing employees and determining the rate and method of payment. Upon information and belief, Degan-Nikas resides in Greece.

21. Defendant Kristen Schorp is and was at all times a member of Stuart Dean's Board of Directors. At all relevant times, Schorp exercised control over the managerial operations of Stuart Dean, including the policies and procedures related to hiring and firing employees and determining the rate and method of payment. Upon information and belief, the State of Louisiana.

## JURIDICTION AND VENUE

BN 40609792v1

22.     Jurisdiction is proper under federal diversity jurisdiction, 28 U.S.C. § 1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.00.

23.     Venue is proper in the United States District Court for the Southern District of New York under 28 U.S.C. § 1391(b)-(c), because Stuart Dean's principal place of business is located within this district, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

## FACTUAL ALLEGATIONS

### I.     Hallett's Employment With Stuart Dean

24.     As set forth above, Hallett commenced his employment with Stuart Dean, as President and CEO, in or about March 2018.

25.     Prior to his employment with Stuart Dean, Hallett's professional experience included an impressive career with Time-Warner, where he was president of Time Magazine from 1995 to 2002, and then Sports Illustrated from 2002 to 2004. During Hallett's tenure, TIME was twice named as America's "Hottest Magazine." It had not been on the list since 1984, when it was seventh. Hallett also served as managing director of Time, Inc. Magazines Pty., Ltd. He has also served as CEO of Murdoch Books, based in Sydney, Australia, was president of MyPublisher, an Internet-based photo book publisher based in New York, and served as publisher at Playbill magazine. He has also served as a consultant to a variety of companies, including Institutional Investor, News Corp and Veria.

26.     As a result of this impressive background, Hallett was asked to join Stuart Dean's Board of Directors in 2011, indicating that his marketing and sales background would add a new dimension to the Board's skill set.

27.     After serving seven years on the Company's Board, Hallett was then approached to become the next President and CEO of Stuart Dean with all of its attendant duties and responsibilities, including the possibility of the sale of the company.

28.     In conversations prior to his appointment as CEO, then Board Chairman Michael Degan affirmed to Hallett that the shareholders were eager to sell the Company if a satisfactory

price was met. At the time, outside experts had valued the Company at somewhere between $12M and $18M. Hallett indicated that he was willing to commit to a three-year term as Stuart Dean's CEO, but the Chairman specifically asked that he not to make that a hard stop, as he wanted to be assured that in the event of a sale, Hallett would be available for a transition period.

29.  On or about March 12, 2018, Hallett signed an Employment Agreement with Stuart Dean. A true and correct copy of the Employment Agreement is attached hereto as Exhibit A.

30.  Hallett at all times performed his duties for Stuart Dean fully, diligently and successfully.

31.  Within the first few months of his employment, Hallett began conversations with one of the Company's most important competitors in the Southeast—Mid-America Metals—in an effort to address the Company's chronic losses in its Miami, Atlanta, and Charlotte offices. Notably, during the final negotiations with Mid-America Metals in the fourth quarter of 2019, the Board, Board Chairman Tim Shea, and Board Member Adriene Bailey, were insistent that nothing in the final agreement preclude a sale of Stuart Dean to a third party.  "No poison pill" was the phrase repeated over and again.

32.  Hallett also focused his efforts on increasing accountability across the organization, sharpening attention on costs, labor, and direct margins; and built a new strategy for their national account group.

33.  Based on these actions, the Company saw significant improvements reflected in the 2019 results.

34.  The improvements also made the Company more attractive to investors. In the fall of 2019, Thomas Lawless, Stuart Dean's National Director of Business Development, informed Hallett that he had been approached by Jay Leyden, President and CEO of Pritchard Industries, Inc., regarding a possible acquisition of the Company. Hallett, along with Tom Lawless and Colin Turcotte, Stuart Dean's COO, met with Leyden and Pritchard's head of operations for New York, shortly thereafter, during which Leyden reiterated his willingness to explore a potential purchase. But no formal commitments were made at that time.

35.     In the days that followed, Hallett informed Board Chairman Tim Shea of Pritchard's approach. He did not name the prospective buyer because it was premature to do so, and confidentiality in the early stages of any sale is customary.  Its absence can deter progress. Chairman Shea, for his part, did not raise any objection to keeping the prospective buyer anonymous. In fact, he encouraged Hallett to continue his discussions with Pritchard, albeit on an informal basis.

36.     Hallett and his management team continued informal discussions with Pritchard throughout the fourth quarter of 2019 and into the first months of 2020. Hallett suggested to Leyden that he believed Stuart Dean may be purchased for "one-time revenue" – or for a price slightly above $60M (approximately three times Gross Margin). Leyden did not dismiss the price, but indicated he would need more information in order to validate the price.

37.     As conversations with Pritchard continued, Board member Chris Degan reported that the results of a recent shareholder survey showed that a significant number of shareholders were eager to sell the Company sooner rather than later. Outside the survey results, Degan also indicated that he had heard from a number of older shareholders who wanted the liquidity of a sale now. That finding was also consistent with conversations Hallett had had with several shareholders toward the end of 2019, as well as Stuart Dean's former CEO, Jim Degan.

38.     The momentum towards an offer from Pritchard continued after the first of the year. The Board authorized Chris Degan to undertake a second shareholder survey in January 2020 to affirm that many of the shareholders were eager to sell sooner rather than later and to gain insight into the price which the shareholders would consider acceptable. In replying to the survey, there was support for a prompt sale and none of the shareholders replying to the survey suggested that the Company should wait for an offer in excess of $40M.

39.     Pritchard subsequently provided an IOI letter in or about March 11, 2020, putting a $37M to 47M change of control valuation on the Company.

## II. Hallett's Promised Compensation

40. Pursuant to the Employment Agreement, the Company agreed that Hallett would receive an annual Base Salary of $425,000 and an Annual Bonus with a target payout of $175,000, or 40% of Base Salary, whichever is greater, based upon the achievement of annual targets under a weighted plan comprising three components, i.e., profit, growth, and Board Specified Special objectives, subject to the terms and conditions of the Bonus Plan to be reviewed and approved annually by the Board. The 2018 Bonus Plan attached to the Agreement provided that: "[t]he annual incentive will be calculated based on the following criteria and consist of three (3) components: Profitability, Operating Revenue Growth & Board Directive Strategic Goals. Abnormal non-recurring income or expense items are to be removed from the calculation." (Ex. A, §§ 2(3), (4).)

41. The Employment Agreement also provided that Hallett was eligible to participate in the Company's Long Term Incentive Plan (the "LTIP"), the terms of which would be mutually agreed upon by the parties. (Ex. A, § 2(7).)

42. He was also entitled to receive the following benefits: (i) Company paid health and dental insurance; (ii) Company's 401(k) Retirement Plan; (iii) a $5,000 net bonus; and (iv) other benefits as may be provided by the Company and for which Mr. Hallett was eligible. (Ex. A, § 2(8).)

43. Notwithstanding the Company's clear contractual obligation to do so, the Board failed to create a viable LTIP during his two years as CEO. Many assurances were given during Compensation Committee reports to the Board that a long term incentive plan was imminent, but none was forthcoming. In 2018, the Board proposed a plan "in lieu of an LTIP" that provided compensation above and beyond salary and bonus based on 2019 revenue increases.

44. A review of the Board meeting minutes from 2017 through 2019 reflect the repeated assertions by Defendants that an LTIP was on its way. Even as late as August 2019, the Board's meeting minutes reflect (as amended): "Target date for Board DRAFT [of the LTIP] is on or before January 17, 2020 with March 6, 2020 as target date for Board approval."

8

45.     As an independent Board member, Hallett had served on the Compensation Committee and actively participated in the creation of the LTIP for then CEO—Mark Parrish. The plan, designed with the assistance of PayGovernance, offered multi-million dollar payouts to the CEO if the value of Stuart Dean increased significantly during the period between 2013 and 2018. Payouts of the plan vested immediately in the event of a change of control at the Company. Early in 2019, Hallett was assured by Tim Shea that he could expect to be contacted by PayGovenance regarding the plan. No call ever came. A copy of the Parrish Plan was also circulated to the Board in mid-2019 for its consideration as a model for Hallett's LTIP.

46.     Having failed to present on its promise to deliver an LTIP, Hallett emailed the Company's Compensation Committee regarding the omission on or about February 24, 2020. The Committee Chairman Scott Halstead responded two days later, on or about February 26, 2020, indicating that Hallett would not be receiving any LTIP, as he was no longer eligible given there was only a year left of his employment term. Hallett immediately responded to the Committee (copying Board Chairman Tim Shea), disputing their conclusion and stating that such failure constituted a material breach of his Employment Agreement; citing, among other reasons, the possibility of a sale in the ensuing 12 months. He received no response.

47.     Because of Hallett's efforts as CEO, an investor wanted to buy into the Company and provided an IOI letter, putting a $37M to 47M change of control valuation on the Company. Stuart Dean's failure to deliver the promised LTIP thereby deprived Hallett of millions of dollars in compensation.

### III.  Hallett's Termination

48.     On March 7, 2020, Chairman Shea informed Hallett in a telephone call that the Board "was going in a different direction" and that he would be terminated by "unanimous vote" of the Board the following day. Shea declined to provide a specific reason, simply stating "we're not getting into that." Nonetheless, Shea assured Hallett that he would receive six month's severance pay in accordance with the terms with his Employment Agreement, regardless of whether he resigned or was terminated. Shea also indicated that he would recommend to the Board

that Hallett receive a performance bonus for 2019, assuming he agreed to sign a general release. Before the end of the day, Hallett informed Chairman Shea that he was unwilling to resign.

49.     On March 8, 2020, the Company sent a formal letter regarding Hallett's termination, giving no indication or reason for "*Cause*," stating only that: "If the Company determines that there is no cause for your termination pursuant to Section 10 of the Employment Agreement, you will be provided with a Separation Agreement and General Release thereto…" A true and correct copy of the March 8 Letter is attached as <u>Exhibit B</u>.

50.     The Company then sent another termination letter on March 13, 2020, for the first time indicating that Hallett was being terminated for *Cause*, stating: "[t]he Company believes that you have engaged in acts of willful misconduct in connection with your duties as CEO as it relates to unapproved and prohibited negotiations with a potential business partner thereby warranting termination under Section 10(a)(ii)(D)." The letter further provides that the Company "[will] [is willing] to construe your termination as without cause under Section 10, Subsection C [if you sign an Agreement and General Release]," but "any participation or coverage to which you may have been entitled under the Company's benefit plans or other benefits outlined in your Employment Agreement expire on March 9, 2020, except your health insurance will expire on March 8…" A true and correct copy of the March 13 letter is attached hereto as <u>Exhibit C</u>.

51.     On March 18, 2020, Mr. Hallett sent an email to Chairman Shea, recounting the conversation they had had on March 7, 2020.  The email stated that: "I asked you whether or not it might be wise to postpone the Board decision on my termination as there was a likelihood that an IOI might be forthcoming from the same firm that had expressed interest in acquiring Stuart Dean in the fall of 2019—which you had been informed of by me at the outset of discussions and of which you had been regularly informed. You said "no". Paraphrasing, you said things would unfold in due course and I would have no role whatsoever in the organization following my termination or resignation…" Hallett received no response from Shea.

52.     Section 10 of the Employment Agreement sets forth the terms governing termination. If terminated without *Cause*, Hallett was entitled to receive: (i) his Base Salary

10

through the date of termination; (ii) reimbursement for any unpaid business expenses; (iii) all benefits to which he was entitled under the Company's benefit plans; (iv) an additional six months of his Base Salary; and (v) up to twelve month's reimbursement for health insurance premiums.

53.     If terminated for *Cause*, Hallett would only receive: (i) his Base Salary through the date of termination; (ii) reimbursement for any unpaid business expenses; and (iii) all benefits to which he would be entitled under the Company's benefit plans. (Ex. A, § 10(a)(iii).)

54.     The Employment Agreement defines *Cause* as: (a) continued failure substantially to perform his duties for a period of 10 business days following written notice by the Company, (b) dishonesty of his duties, (c) an act or acts constituting a felony or misdemeanor involving moral turpitude, (d) willful misfeasance or willful misconduct in connection with his duties or any act or omission which is materially injurious to the financial condition or business reputation of the Company, or (e) improper use of confidential information. (Ex. A, § 10(a)(ii).)

55.     Whether or not terminated for *Cause*, Hallett was still entitled to full payment of all monies which Stuart Dean agreed to pay him under the Employment Agreement, including without limitation, the annual bonus and incentive compensation under the LTIP.

56.     Upon information and belief, the LTIP payments to which Hallett is entitled amount to millions of dollars in unpaid compensation.

57.     In addition, pursuant to Stuart Dean's established policies and practices concerning the payment of severance, Hallett is entitled to severance pay and other benefits which have not been paid to him.

58.     Stuart Dean has expressly refused and failed to make any of the above described payments to him notwithstanding Hallett's demands therefor.

59.     Prior to commencing suit, a demand letter was sent to the Company in an attempt to resolve these matters informally. The Company has continued to refuse to pay the monies owed and has continued to act in bad faith forcing Hallett to commence this legal action.

## COUNT 1

### (Breach of Contract - Wrongful Termination Against the Company)

60.     Hallett incorporates by reference each and every allegation set forth in the preceding Paragraphs above as if set forth fully herein.

61.     The Employment Agreement entered into by Hallett and Stuart Dean is a valid and enforceable contract under New York law.

62.     Hallett duly performed the terms and conditions of the Employment Agreement, and the Company accepted and benefited from the services performed by Hallett.

63.     As set forth above, Hallett was appointed as CEO of the Company based on his background of experience.  Included in his responsibilities both generally and specifically was a duty to entertain the interest of potential investors.

64.     After learning of Pritchard's initial approach, Hallett informed two members of the Board that informal discussions were ongoing with an investor regarding a potential acquisition.

65.     If such discussions were prohibited, pursuant to Section 10(a)(ii) of the Employment Agreement, the Board was required to provide Hallett with 10-days written notice of his alleged failure to substantially perform under the contract.

66.     No such notice was provided.

67.     The wavering reasons offered by the Company and the Board for Hallett's termination from no reason, to alleged willful misconduct for engaging in purportedly unapproved negotiations, to a Company shift towards a willingness to construe his termination without cause, shows the pretextual nature of his ouster.

68.     Defendant has breached its contractual obligations under the Employment Agreement by terminating Hallett under the pretext of his alleged misconduct, and by failing to pay him the compensation owed as a result of his termination, including without limitation, his severance pay and benefits.

69.     As a direct and proximate result of Defendant's breach, Hallett has been damaged in the amount to be determined at trial.

12

## COUNT 2

### (Breach of Contract - Failure to Pay Bonus Compensation Against the Company)

70.     Hallett incorporates by reference each and every allegation set forth in the preceding Paragraphs above as if set forth fully herein.

71.     As set forth above, Hallett entered into a valid and enforceable Employment Agreement with Stuart Dean.

72.     Pursuant to Section 2(4) of the Employment Agreement, Stuart Dean agreed to and was obligated to pay the annual bonus due Hallett for 2019.

73.     Pursuant to Section 2(7) of the Employment Agreement, Stuart Dean agreed to and was obligated to provide an LTIP, from which Hallett could earn additional incentive compensation.

74.     As described above, after Hallett accepted and commenced his employment with Stuart Dean, the Company failed to create a viable LTIP for Hallett. Many assurances were given during Compensation Committee reports to the Board that a plan was imminent, but none was forthcoming. When Hallett attempted to address the issue, the Company refused to provide any proposal, claiming he was no longer eligible given that there was only a year left of his employment. There is no such limitation in the Agreement.

75.     The failure of the Company to provide an LTIP constitutes a breach of contract.

76.     In addition, Hallett met or exceeded all targets set forth in the Employment Agreement, entitling him to receive the nondiscretionary annual bonus provided therein.

77.     By failing to pay him the 2019 nondiscretionary annual bonus, Defendant breached its contractual obligations to Hallett under the Employment Agreement.

78.     As a direct and proximate result of Defendant's breach, Hallett has been damaged in the amount to be determined at trial.

## COUNT 3

### (Failure to Pay Wages in Violation of New York Labor Law Against All Defendants)

79.     Hallett incorporates by reference each and every allegation set forth in the preceding Paragraphs above as if set forth fully herein.

80.     Pursuant to the New York Labor Law ("NYLL"), Defendants acted as Hallett's employer within the meaning of NYLL § 193.

81.     Pursuant to the Employment Agreement, Defendants promised to pay Hallett compensation in the form of an annual bonus and LTIP. Such compensation was non-discretionary and fully vested at the time of Hallett's termination.

82.     Despite multiple demands, Defendants knowingly and willfully withheld Hallett's earned compensation upon termination when Defendant failed to pay Hallett his annual bonus and other incentive compensation owed under the LTIP.

83.     Defendant's refusal to pay Hallett the aforementioned incentive compensation constitutes an unlawful deduction in violation of NYLL § 193.

84.     Defendant's withholding of the foregoing compensation due and owing to Hallett was willful and done in bad faith. Accordingly, Hallett is entitled to liquidated damages equal to 100% of the unpaid wages due and owing to him pursuant to NYLL § 198(1-a).

85.     Hallett is also entitled to recover all reasonable attorneys' fees incurred in connection with his claim, along with prejudgment interest pursuant to NYLL § 198(1-a).

86.     Due to the control and involvement of the individual Board members, they are individually liable for wage violations under the NYLL.

87.     As a direct and proximate result of Defendant's breaches of the NYLL, Hallett has been damaged in an amount to be determined at trial, and is entitled to an award of liquidated damages, attorneys' fees, and prejudgment interest owed in connection with these violations.

BN 40609792v1

## COUNT 4

### (Retaliation Under NYLL Against All Defendants)

88.    Hallett incorporates by reference each and every allegation set forth in the preceding Paragraphs above as if set forth fully herein.

89.    As set forth above, despite its obligation under the Employment Agreement, the Company failed to provide Hallett with a viable LTIP during his two years as CEO. Multiple assurances were made during Compensation Committee reports to the Board that a plan was imminent, none was forthcoming.

90.    On or about February 24, 2020, Hallett emailed the Compensation Committee regarding the omission. The Committee replied on or about February 26, 2020, declaring that he was no longer entitled to an LTIP because there was only a year left of his employment term. Hallett immediately wrote back (copying Board Chairman Tim Shea), disputing their conclusion and stating that such failure constituted a material breach of his Employment Agreement. He received no response.

91.    Not long thereafter, on or about March 8, 2020, Hallett was terminated.

92.    As set forth above, by failing to provide an LTIP, Defendants deprived Hallett of millions of dollars in nondiscretionary incentive compensation to which he was entitled, in violation of NYLL § 193.

93.    Under NYLL § 215(1)(a), "No employer…shall discharge…or retaliate against any employee (i) because such employee has made a complaint to his or her employer…that the employer has engaged in conduct that the employee…believes violates" the NYLL.

94.    Hallett engaged in a protected activity when he complained to the Committee about the Company's failure to provide an LTIP, in violation of the NYLL.

95.    Shortly after receiving his complaint, Defendants terminated Hallett under the guise of pretextual misconduct.

96.    By retaliating against Hallett for his complaint regarding their violations of the NYLL, Defendants violated NYLL§ 215.

97.     At all relevant times, the individual Defendants and/or other wrongdoers acted as agents of the Company, and the Company is vicariously liable for their actions.

98.     As a result of the retaliatory animus, Hallett has suffered damages, including but not limited to, reputational harm, and is entitled to equitable and monetary relief including but not limited to compensatory and other damages, reasonable attorneys' fees and costs, punitive damages, and other appropriate relief.

99.     Notice of this claim has been served upon the Attorney General pursuant to NYLL § 215(2).

## COUNT 5

### (Promissory Estoppel Against All Defendants)

100.    Hallett incorporates by reference each and every allegation set forth in the preceding Paragraphs above as if set forth fully herein.

101.    As described above, Defendants induced Hallett to sign on and stay as CEO of the Company with the promise that he would be eligible to participate in the Company's LTIP pursuant to his Employment Agreement, entitling him to receive millions of dollars in additional compensation upon a sale of the Company.

102.    After Hallett accepted and commenced his employment with Stuart Dean, the Company failed to enter into any conversations with him regarding the creation of a viable LTIP. Many assurances were given during Compensation Committee reports to the Board that a plan was imminent, but none was forthcoming. Even as late as August 2019, the Board's meeting minutes reflect (as amended): "Target date for Board DRAFT is on or before January 17, 2020 with March 6, 2020 as target date for Board approval." A copy of the Parrish plan that Hallett had helped create for the former CEO was also circulated to the Board in mid-2019 for consideration as a model for Hallett's LTIP.

103.    When there was still no LTIP by the end of February 2020, Hallett contacted the Compensation Committee, at which time they informed him there would be no proposal given there only a year left of his employment. He was subsequently terminated shortly thereafter.

104.     Hallett reasonably and justifiably relied on Defendants' promises regarding an LTIP that would provide millions of dollars in additional non-discretionary compensation.

105.     At all relevant times, the individual Defendants and/or other wrongdoers acted as agents of the Company, and the Company is vicariously liable for their actions.

106.     As a direct and proximate result of Defendants' breach, Hallett has suffered damages in an amount to be determined at trial.

## COUNT 6

### (Breach of Implied Covenant of Good Faith and Fair Dealing Against All Defendants)

107.     Hallett incorporates by reference each and every allegation set forth in the preceding Paragraphs above as if set forth fully herein.

108.     The Employment Agreement between Hallett and Stuart Dean contained implied covenants of good faith and fair dealing.

109.     These implied covenants obligated the Defendants to refrain from doing any act that would deprive Hallett of the benefits of the Employment Agreement, or that would impede Hallett from performing any or all of the conditions of the Employment Agreement that he agreed to perform.

110.     Defendants' misconduct described herein breached the implied covenant of good faith and fair dealing in connection with the LTIP and other monies owed under the Employment Agreement.

111.     In particular, Defendants induced Hallett to sign on and stay as CEO of the Company with the promise that he would be provided an LTIP entitling him to additional compensation, then interfered with his right to receive such compensation by failing to deliver an LTIP, fabricating pretextual misconduct, and prematurely terminating him solely to avoid paying the compensation that he would otherwise be owed in connection with a sale of the Company.

112.     At all relevant times, the individual Defendants and/or other wrongdoers acted as agents of the Company, and the Company is vicariously liable for their actions.

113.     As a direct and proximate result of Defendants' breach, Hallett has been damaged.

**COUNT 7**

**(Fraudulent Inducement Against All Defendants)**

114.    Hallett incorporates by reference each and every allegation set forth in the preceding Paragraphs above as if set forth fully herein.

115.    As described above, Defendants made false representations and misrepresentations of material fact regarding Hallett's participation in an LTIP that would entitle him to receive additional compensation in the event of a sale of the Company pursuant to his Employment Agreement.

116.    The representations made by the Company and Board regarding the LTIP were untrue and known to be untrue by Defendants, but were made for purposes of inducing Hallett's reliance thereon.

117.    Hallett, unaware of the falsity of the representations, reasonably and justifiably relied on the representations to his detriment.

118.    At all relevant times, the individual Defendants and/or other wrongdoers acted as agents of the Company, and the Company is vicariously liable for their actions.

119.    As a direct and proximate result of Defendants' fraudulent misrepresentations, Hallett has been damaged.

**COUNT 8**

**(Negligent Misrepresentation Against All Defendants)**

120.    Hallett incorporates by reference each and every allegation set forth in the preceding Paragraphs above as if set forth fully herein.

121.    As described above, Defendants were careless in imparting false promises and misrepresentations regarding an LTIP to Hallett, which they should have known were incorrect, and which they knew Hallett was expected to rely on in considering whether he would agree to join as Stuart Dean's CEO.

122.    Defendants had a duty to provide Hallett with complete and accurate information.

18

123.    Defendants knew that the promises they made regarding the LTIP were desired by Hallett for purposes of determining whether he would agree to accept their proposed terms for his employment as CEO.

124.    At all relevant times, the individual Defendants and/or other wrongdoers acted as agents of the Company, and the Company is vicariously liable for their actions.

125.    As a direct and proximate result of Defendants' negligent misrepresentations, Hallett has been damaged.

## COUNT 9

### (Defamation Against All Defendants)

126.    Hallett incorporates by reference each and every allegation set forth in the preceding Paragraphs above as if set forth fully herein.

127.    Defendants published false and defamatory statements in its March 13, 2020 termination letter regarding his alleged "willful misconduct," which did or had the tendency to expose Hallett to disgrace.

128.    The defamatory statements in the letter are of and concerning Hallett and reasonably understood to be about Hallett.

129.    Defendants published the defamatory statements in the letter knowing they are false or with reckless disregard for the truth of the statements.

130.    The false and defamatory statements in the letter constitute defamation *per se* because they tend to injure Hallett in his trade, business or profession.

131.    The defamatory statements in the letter have directly and proximately caused Hallett to suffer significant damages, including damage to his reputation, humiliation, embarrassment, shame, and emotional distress. The damages are ongoing in nature and will continue to be suffered in the future.

132.    Defendants' conduct was committed knowingly, intentionally, willfully, wantonly, and maliciously, with the intent to harm Hallett, or in blatant disregard of the substantial likelihood of causing him harm, thereby entitling Hallett to an award of punitive damages.

BN 40609792v1

133. At all relevant times, the individual Defendants and/or other wrongdoers acted as agents of the Company, and the Company is vicariously liable for their actions.

134. As a direct and proximate result of Defendants' conduct, Hallett is entitled to compensatory, special, and punitive damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Bruce Hallett respectfully prays for the following:

a. On Count 1, a judgment in an amount to be determined at trial;

b. On Count 2, a judgment in an amount to be determined at trial;

c. On Count 3, a judgment in an amount to be determined at trial, along with reasonable attorneys' fees, liquidated damages, prejudgment interest, and costs;

d. On Count 4, a judgment in an amount to be determined at trial, along with reasonable attorneys' fees, liquidated damages, prejudgment interest, and costs;

e. On Count 5, a judgment in an amount to be determined at trial;

f. On Count 6, a judgment in an amount to be determined at trial;

g. On Count 7, a judgment in an amount to be determined at trial, along with punitive damages;

h. On Count 8, a judgment in an amount to be determined at trial;

i. On Count 9, a judgment in an amount to be determined at trial, along with special and punitive damages; and

j. On all Counts, Judgment for Plaintiff against Defendants for reasonable attorneys' fees, costs, prejudgment and post-judgment interest, and such further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a jury trial on all triable issues.

DATED: May 18, 2020

BUCHALTER
A Professional Corporation

By: _/s/ Ashley L. Milnes_ _____
    Tracy A. Warren, Esq.
    (*Pro Hac Vice Forthcoming*)
    Ashley L. Milnes, Esq.
    (*Pro Hac Vice Forthcoming*)
    Buchalter, A Professional Corporation
    655 W. Broadway, Suite 1625
    San Diego, California 92101
    Phone: (619) 219-5360
    twarren@buchalter.com
    amilnes@buchalter.com

    *Attorneys for Plaintiff Bruce Hallett*

DATED: May 18, 2020

CALCAGNI & KANEFSKY LLP

By: _____
    Lauren M. Paxton, Esq.
    Calcagni & Kanefsky, LLP
    85 Broad Street, Suite 17031
    New York, New York 10004
    Phone: 862-233-8130
    Fax: 862-902-5458
    LPaxton@ck-litigation.com

    *Local Counsel for Plaintiff Bruce Hallett*

BN 40609792v1

# EMPLOYMENT AGREEMENT

## (Bruce Hallett)

EMPLOYMENT AGREEMENT (the "Agreement") dated March __, 2018, by and between Stuart Dean Co., Inc. (the "Company") and Bruce Hallett (the "Executive").

**WHEREAS,** the Company offered Executive employment as its Chief Executive Officer ("CEO") & President and desires to enter into an agreement embodying the terms of such agreement;

**WHEREAS,** Executive desires to accept such employment and enter into such an agreement;

**NOW, THEREFORE,** in consideration of the promises and mutual covenants herein and for other good and valuable consideration, the parties agree as follows:

1. <u>Term and Location of Employment</u>.  Executive shall be employed by the Company hereunder for a period commencing no later than March 12, 2018 (the "Commencement Date") and ending upon termination of Executive's employment pursuant to Section 10 of this Agreement (the "Employment Term").

2. <u>Position</u>.

    a.      During the Employment Term, Executive shall serve as the Company's CEO & President.  In such position, Executive shall have such duties and authority commensurate with such position as shall be determined from time to time by the Board of Directors of the Company (the "Board").

    b.      During the Employment Term, Executive will devote Executive's full business time and best efforts to the performance of Executive's duties hereunder and will not engage in any other business, profession or occupation for compensation or otherwise which would conflict or interfere with the rendition of such services either directly or indirectly, without the prior written consent of the Board.

    c.      The Company's CEO & President is a voting member of the Board.  Pursuant to the Bylaws of the Company's Shareholder Agreement, all elected Board members, including the CEO & President, are subject to annual approval each May.

3. <u>Base Salary</u>. During the Employment Term, the Company shall pay Executive a base salary at the annual rate of $425,000, payable in weekly installments in accordance with the Company's usual payroll practices. The Board shall review Executive's base salary on an annual basis and may, in its discretion, increase (but not decrease) Executive's base salary hereunder. Executive's annual base salary, as in effect from time to time, is hereinafter referred to as the "<u>Base Salary</u>."

4. <u>Annual Bonus</u>. Executive shall be eligible to earn an annual bonus award ("<u>Annual Bonus</u>") with a target payout of $175,000, or 40% of Base Salary, whichever is greater, based upon the achievement of annual targets under a weighted plan comprising three components, *i.e.* profit, growth, and Board Specified Special objectives according to a 50-25-25 allocation thereof, subject to the terms and conditions of the Bonus Plan to be reviewed and approved annually by the Board. The Annual Bonus Plan for 2018 is attached as Exhibit A. The Annual Bonus, if any, shall be paid to Executive no later than March 15 of the following year.

5. <u>Vacation Leave Allowance</u>. Executive is entitled to up to fifteen (15) vacation days annually (including during his first year of employment ending), two (2) personal days' leave, and ten (10) Company-observed holidays, subject to the terms and conditions of the Company's applicable policies.

6. Relocation: Not Applicable

7. <u>Long Term Incentive Plan</u>. During the Employment Term, Executive shall be eligible to participate in the Company's Long Term Incentive Plan (the "<u>LTIP</u>") which will be mutually agreed by the Company and Executive"? The terms of the LTIP are subject to annual review by the Board.

8. <u>Employee Benefits</u>. During the Employment Term, Executive shall be entitled to participate in the Company's employee benefit plans as may be in effect from time to time (collectively "<u>Employee Benefits</u>"), on the same basis as those benefits are generally made available to other senior executives of the Company, which benefits, in any event, shall include the following:

a.     Company paid health and dental insurance, flexible spending account, life, and short and long-term disability, less applicable employee contribution amounts;

b.     Company's 401(k) Retirement Plan;

c.    a $5,000 net bonus which may be applied by Executive in lieu of Company payment of any insurance premium; and

d.    Other benefits as may be provided by the Company and for which Executive is eligible.

9.  <u>Business Expenses and Perquisites</u>.

a.    <u>Expenses</u>.  During the Employment Term, reasonable business expenses incurred by Executive in the performance of Executive's duties hereunder shall be reimbursed by the Company in accordance with Company policies.

b.    <u>Perquisites</u>.  During the Employment Term, Executive shall be entitled to receive the following perquisites:

(i) Parking allowance – up to $6,000 annually, on a gross basis, subject to taxes and withholding; and

(ii) Club Allowance – up to $10,000 annually on a net basis.

10.  <u>Termination</u>.  The Employment Term and Executive's employment hereunder may be terminated by either party at any time and for any reason; provided that Executive will be required to give the Company at least ninety (90) days advance written notice of any resignation of Executive's employment. Notwithstanding any other provision of this Agreement, the provisions of this Section 10 shall exclusively govern Executive's rights upon termination of employment with the Company and its affiliates.

a.    <u>By the Company For Cause or By Executive Resignation Without Good Reason</u>.

(i)  The Employment Term and Executive's employment hereunder may be terminated by the Company for Cause (as defined below) and shall terminate automatically upon Executive's resignation without Good Reason (as defined in Section 10(c)); provided that Executive will be required to give the Company at least ninety (90) days advance written notice of a resignation without Good Reason.

(ii)  For purposes of this Agreement, "<u>Cause</u>" shall mean (A) Executive's continued failure substantially to perform Executive's duties hereunder (other than as a result of total or partial incapacity due to physical or mental illness) for a period of ten (10) business days following written notice by

3

the Company to Executive of such failure, (B) dishonesty in the performance of Executive's duties hereunder, (C) an act or acts on Executive's part constituting (x) a felony under the laws of the United States or any state thereof or (y) a misdemeanor involving moral turpitude, (D) Executive's willful malfeasance or willful misconduct in connection with Executive's duties hereunder or any act or omission which is materially injurious to the financial condition or business reputation of the Company or any of its subsidiaries or affiliates or (E) Executive's breach of the provisions of Sections 11 or 12 of this Agreement.

(iii) If Executive's employment is terminated by the Company for Cause, or if Executive resigns without Good Reason, Executive shall be entitled to receive:

(A) the Base Salary through the date of termination;

(B) reimbursement, within 60 days following submission by Executive to the Company of appropriate supporting documentation for any unreimbursed business expenses properly incurred by Executive in accordance with Company policy prior to the date of Executive's termination; provided claims for such reimbursement (accompanied by appropriate supporting documentation) are submitted to the Company within 90 days following the date of Executive's termination of employment; and

(C) such Employee Benefits, if any, as to which Executive may be entitled under the employee benefit plans of the Company (the amounts described in clauses (A) through (C) hereof being referred to as the "Accrued Rights").

Following such termination of Executive's employment by the Company for Cause, except as set forth in this Section 10(a)(iii), Executive shall have no further rights to any compensation or any other benefits under this Agreement.

b. Disability or Death.

(i) The Employment Term and Executive's employment hereunder shall terminate upon Executive's death and may be terminated by the Company if Executive becomes physically or mentally incapacitated and is therefore unable for a period of six (6) consecutive months or for an aggregate of nine (9) months in any twenty-four (24) consecutive month period to perform Executive's duties (such incapacity is hereinafter referred to as "Disability"). Any question as to the existence of the Disability of Executive as to which Executive and the Company

4

cannot agree shall be determined in writing by a qualified independent physician mutually acceptable to Executive and the Company.  If Executive and the Company cannot agree as to a qualified independent physician, each shall appoint such a physician and those two physicians shall select a third who shall make such determination in writing.  The determination of Disability made in writing to the Company and Executive shall be final and conclusive for all purposes of the Agreement.

(ii)  Upon termination of Executive's employment hereunder for either Disability or death, Executive, Executive's Estate, or Executive's Immediate Family or Survivors (as the case may be) shall be entitled to receive:

(A)     the Accrued Rights; and

(B)     The Company will reimburse Executive and Executive's Immediate Family or Survivors (as the case may be), if otherwise entitled to continued health insurance benefits under COBRA, for the cost of premiums for such benefits for a period not to exceed twelve months.

Following such termination of Executive's employment due to death or Disability, except as set forth in this Section 10(b)(ii), Executive, Executive's Estate or Executive's Immediate Family or Survivors shall have no further rights to any compensation or any other benefits under this Agreement.

c.     By the Company Without Cause or Resignation by Executive for Good Reason.

(i)     The Employment Term and Executive's employment hereunder may be terminated by the Company without Cause or by Executive's resignation for Good Reason.

(ii)     For purposes of this Agreement, "Good Reason" shall mean (A) the failure of the Company to pay or cause to be paid Executive's Base Salary or Annual Bonus, when due hereunder or (B) any substantial and sustained diminution in Executive's authority or responsibilities from those described in Section 2 hereof; provided that either of the events described in clauses (A) and (B) of this Section 10(c)(ii) shall constitute Good Reason only if the Company fails to cure such event within 30 days after receipt from Executive of written notice of the event which constitutes Good Reason; provided, further, that "Good Reason" shall cease to exist for an event on the 60th day following the later of its occurrence or Executive's knowledge thereof, unless Executive has given the Company written notice thereof prior to such date.  Additionally, a

termination of employment by Executive for any reason during the thirty-day period following the first ninety days after a Change of Control becomes effective, shall be deemed to constitute a Resignation for Good Reason for purposes of this Agreement.  For purposes of this Agreement, a "Change of Control" shall mean the occurrence of any of the following events: i) the sale of all or substantially all the assets of the Company to a person or group who presently owns less than 50% of the Company or an affiliate thereof; (ii) a liquidation of the Company; or (iii) the merger or consolidation of the Company with any other corporation or entity.

(iii)    If Executive's employment is terminated by the Company without Cause (other than by reason of death or Disability) or if Executive resigns for Good Reason, Executive shall be entitled to receive:

(A)    the Accrued Rights;

(B)    subject to Executive's continued compliance with the provisions of Sections 11 and 12, continued payment of the Base Salary in accordance with the Company's normal payroll practices, as in effect on the date of termination of Executive's employment, until six (6) months after the date of such termination; and

(C)    payment or reimbursement of health insurance premiums under COBRA for up to twelve (12) months, or until such time as Executive is eligible for substantially similar health insurance coverage through a subsequent employer's health plan or Medicare.

Following Executive's termination of employment by the Company without Cause (other than by reason of Executive's death or Disability) or by Executive's resignation for Good Reason, except as set forth in Sections 10(c)(iii), Executive shall have no further rights to any compensation or any other benefits under this Agreement.

d.    Notice of Termination.  Any purported termination of employment by the Company or by Executive (other than due to Executive's death) shall be communicated by written Notice of Termination to the other party hereto in accordance with Section 14(h) hereof.  For purposes of this Agreement, a "Notice of Termination" shall mean a notice which shall indicate the specific termination provision in this Agreement relied upon and shall set forth in reasonable detail the facts and circumstances claimed to provide a basis for termination of employment under the provision so indicated.

11. Non-Competition.

a.        Executive acknowledges and recognizes the highly competitive nature of the businesses of the Company and its affiliates, further acknowledges that he has no prior business experience in the provision of architectural restoration and maintenance services, and accordingly agrees as follows:

(1)     During the Employment Term and, for a period of two (2) years following the date Executive ceases to be employed by the Company for whatever reason (the "Restricted Period"), Executive will not, whether on Executive's own behalf or on behalf of or in conjunction with any person, firm, partnership, joint venture, association, corporation or other business organization, entity or enterprise whatsoever ("Person"), directly or indirectly solicit or assist in soliciting in competition with the Company, the business of any client or prospective client:

(i)      with whom Executive had personal contact or dealings on behalf of the Company during the one-year period preceding Executive's termination of employment;

(ii)     with whom employees reporting to Executive have had personal contact or dealings on behalf of the Company during the one-year immediately preceding the Executive's termination of employment; or

(iii)    for whom Executive had direct or indirect responsibility during the one-year immediately preceding Executive's termination of employment.

(2)     During the Restricted Period, Executive will not directly or indirectly:

(i)      engage in any business that competes with the business of the Company or its affiliates including, without limitation, (a) businesses which the Company or its affiliates have specific plans to conduct in the future and as to which Executive is aware, and/or (b) entities which provide architectural restoration and maintenance services in any geographical area that is within 50 miles of any geographical area where the Company or its affiliates manufacture, produce, sell, lease, rent, license or otherwise provide products or services (a "Competitive Business");

(ii)     enter the employ of, or render any services to, any Person

7

(or any division or controlled or controlling affiliate of any Person) who or which engages in a Competitive Business;

(iii)     acquire a financial interest in, or otherwise become actively involved with, any Competitive Business, directly or indirectly, as an individual, partner, shareholder, officer, director, principal, agent, trustee or consultant; or

(iv)     interfere with, or attempt to interfere with, business relationships (whether formed before, on or after the date of this Agreement), without limitation, between the Company or any of its affiliates and customers, clients or suppliers of the Company or its affiliates, or any entity to which the Company provides installation, consulting, or other services.

(3)     Notwithstanding anything to the contrary in this Agreement, Executive may, directly or indirectly own, solely as an investment, securities of any Person engaged in the business of the Company or its affiliates which are publicly traded on a national or regional stock exchange or on the over-the-counter market if Executive (i) is not a controlling person of, or a member of a group which controls, such Person and (ii) does not, directly or indirectly, own 5% or more of any class of securities of such Person.

(4)     During the Restricted Period, Executive will not, whether on Executive's own behalf or on behalf of or in conjunction with any Person, directly or indirectly:

(i)     solicit or encourage any employee of the Company or its affiliates to leave the employment of the Company or its affiliates; or

(ii)     hire any such employee who was employed by the Company or its affiliates as of the date of Executive's termination of employment with the Company or who left the employment of the Company or its affiliates coincident with, or within one year prior to or after, the termination of Executive's employment with the Company.

(5)     During the Restricted Period, Executive will not, directly or indirectly, solicit or encourage to cease to work with the Company or its affiliates any consultant then under contract with the Company or its affiliates.

b.     It is expressly understood and agreed that although Executive and the Company consider the restrictions contained in this Section 11 to be reasonable, if a final judicial determination is made by a court of competent jurisdiction that the time or territory or any other restriction contained in this

Agreement is an unenforceable restriction against Executive, the provisions of this Agreement shall not be rendered void but shall be deemed amended to apply as to such maximum time and territory and to such maximum extent as such court may judicially determine or indicate to be enforceable. Alternatively, if any court of competent jurisdiction finds that any restriction contained in this Agreement is unenforceable, and such restriction cannot be amended so as to make it enforceable, such finding shall not affect the enforceability of any of the other restrictions contained herein.

12. <u>Confidentiality; Intellectual Property</u>.

a. <u>Confidentiality</u>.

(i) Executive will not at any time (whether during or after Executive's employment with the Company) (x) retain or use for the benefit, purposes or account of Executive or any other Person; or (y) disclose, divulge, reveal, communicate, share, transfer or provide access to any Person outside the Company (other than its professional advisers who are bound by confidentiality obligations), any non-public, proprietary or confidential information -- including without limitation trade secrets, know-how, research and development, software, databases, inventions, processes, formulae, technology, designs and other intellectual property, information concerning finances, investments, profits, pricing, costs, products, services, vendors, customers, clients, partners, investors, personnel, compensation, recruiting, training, advertising, sales, marketing, promotions, government and regulatory activities and approvals -- concerning the past, current or future business, activities and operations of the Company, its subsidiaries or affiliates and/or any third party that has disclosed or provided any of same to the Company on a confidential basis ("<u>Confidential Information</u>") without the prior written authorization of the Board.

(ii) "Confidential Information" shall not include any information that is (a) generally known to the industry or the public other than as a result of Executive's breach of this covenant or any breach of other confidentiality obligations by third parties; (b) made legitimately available to Executive by a third party without breach of any confidentiality obligation; or (c) required by law to be disclosed; <u>provided</u> that Executive shall give prompt written notice to the Company of such requirement, disclose no more information than is so required, and cooperate with any attempts by the Company to obtain a protective order or similar treatment.

(iii) Except as required by law, Executive will not disclose to anyone, other than Executive's immediate family and legal or financial advisors, the existence or contents of this Agreement; <u>provided</u> that Executive may

disclose to any prospective future employer the provisions of Sections 11 and 12 of this Agreement provided they agree to maintain the confidentiality of such terms.

(iv)     Upon termination of Executive's employment with the Company for any reason, Executive shall (x) cease and not thereafter commence use of any Confidential Information or intellectual property (including without limitation, any patent, invention, copyright, trade secret, trademark, trade name, logo, domain name or other source indicator) owned or used by the Company, its subsidiaries or affiliates; (y) immediately destroy, delete, or return to the Company, at the Company's option, all originals and copies in any form or medium (including memoranda, books, papers, plans, computer files, letters and other data) in Executive's possession or control (including any of the foregoing stored or located in Executive's office, home, laptop or other computer, whether or not Company property) that contain Confidential Information or otherwise relate to the business of the Company, its affiliates and subsidiaries, except that Executive may retain only those portions of any personal notes, notebooks and diaries that do not contain any Confidential Information; and (z) notify and fully cooperate with the Company regarding the delivery or destruction of any other Confidential Information of which Executive is or becomes aware.

b.     Intellectual Property.

(i)     If Executive has created, invented, designed, developed, contributed to or improved any works of authorship, inventions, intellectual property, materials, documents or other work product (including without limitation, research, reports, software, databases, systems, applications, presentations, textual works, content, or audiovisual materials) ("Works"), either alone or with third parties, prior to Executive's employment by the Company, that are relevant to or implicated by such employment ("Prior Works"), Executive hereby grants the Company a perpetual, non-exclusive, royalty-free, worldwide, assignable, sublicensable license under all rights and intellectual property rights (including rights under patent, industrial property, copyright, trademark, trade secret, unfair competition and related laws) therein for all purposes in connection with the Company's current and future business.

(ii)     If Executive creates, invents, designs, develops, contributes to or improves any Works, either alone or with third parties, at any time during Executive's employment by the Company and within the scope of such employment and/or with the use of any of the Company resources ("Company Works"), Executive shall promptly and fully disclose same to the Company and hereby irrevocably assigns, transfers and conveys, to the maximum extent permitted by applicable law, all rights and intellectual property rights therein

10

(including rights under patent, industrial property, copyright, trademark, trade secret, unfair competition and related laws) to the Company to the extent ownership of any such rights does not vest originally in the Company.

(iii)   Executive agrees to keep and maintain adequate and current written records (in the form of notes, sketches, drawings, and any other form or media requested by the Company) of all Company Works.  The records will be available to and remain the sole property and intellectual property of the Company at all times.

(iv)   Executive shall take all requested actions and execute all requested documents (including any licenses or assignments required by a government contract) at the Company's expense (but without further remuneration) to assist the Company in validating, maintaining, protecting, enforcing, perfecting, recording, patenting or registering any of the Company's rights in the Prior Works and Company Works.  If the Company is unable for any other reason to secure Executive's signature on any document for this purpose, then Executive hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as Executive's agent and attorney in fact, to act for and in Executive's behalf and stead to execute any documents and to do all other lawfully permitted acts in connection with the foregoing.

(v)   Executive shall not improperly use for the benefit of, bring to any premises of, divulge, disclose, communicate, reveal, transfer or provide access to, or share with the Company any confidential, proprietary or non-public information or intellectual property relating to a former employer or other third party without the prior written permission of such third party.  Executive hereby indemnifies, holds harmless and agrees to defend the Company and its officers, directors, partners, employees, agents and representatives from any breach of the foregoing covenant.  Executive shall comply with all relevant policies and guidelines of the Company, including regarding the protection of confidential information and intellectual property and potential conflicts of interest. Executive acknowledges that the Company may amend any such policies and guidelines from time to time, and that Executive remains at all times bound by their most current version.

(vi)   The provisions of Section 12 shall survive the termination of Executive's employment for any reason.

13.  <u>Specific Performance</u>.  Executive acknowledges and agrees that the Company's remedies at law for a breach or threatened breach of any of the provisions of Section 11 or Section 12 would be inadequate and the Company

would suffer irreparable damages as a result of such breach or threatened breach. In recognition of this fact, Executive agrees that, in the event of such a breach or threatened breach, in addition to any remedies at law, the Company, without posting any bond, shall be entitled to cease making any payments or providing any benefit otherwise required by this Agreement and obtain equitable relief in the form of specific performance, temporary restraining order, temporary or permanent injunction or any other equitable remedy which may then be available.

14. Miscellaneous.

a. Governing Law. This Agreement and any claim, dispute or controversy arising out of, under, or related to this Agreement, the relationship of the parties hereunder, and/or the interpretation and enforcement of the rights and obligations of the parties hereunder, shall be governed by, interpreted and construed in accordance with the laws of the State of New York, without regard to choice of law principles.

b. Entire Agreement/Amendments. This Agreement contains the entire understanding of the parties with respect to the employment of Executive by the Company. There are no restrictions, agreements, promises, warranties, covenants or undertakings between the parties with respect to the subject matter herein other than those expressly set forth herein. This Agreement may not be altered, modified, or amended except by written instrument signed by the parties hereto.

c. No Waiver. The failure of a party to insist upon strict adherence to any term of this Agreement on any occasion shall not be considered a waiver of such party's rights or deprive such party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement.

d. Severability. In the event that any one or more of the provisions of this Agreement shall be or become invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions of this Agreement shall not be affected thereby.

e. Assignment. This Agreement, and all of Executive's rights and duties hereunder, shall not be assignable or delegable by Executive. Any purported assignment or delegation by Executive in violation of the foregoing shall be null and void *ab initio* and of no force and effect. This Agreement may be assigned by the Company to a person or entity, which is an affiliate or a successor in interest to substantially all of the business operations of the Company. Upon such assignment, the rights and obligations of the

Company hereunder shall become the rights and obligations of such affiliate or successor person or entity.

   f.   Compliance with IRC Section 409A. Notwithstanding anything herein to the contrary, (i) if at the time of Executive's termination of employment with the Company Executive is a "specified employee" as defined in Section 409A of the Internal Revenue Code of 1986, as amended (the "Code") and the deferral of the commencement of any payments or benefits otherwise payable hereunder as a result of such termination of employment is necessary in order to prevent any accelerated or additional tax under Section 409A of the Code, then the Company will defer the commencement of the payment of any such payments or benefits hereunder (without any reduction in such payments or benefits ultimately paid or provided to Executive) until the date that is six months following Executive's termination of employment with the Company (or the earliest date as is permitted under Section 409A of the Code) and (ii) if any other payments of money or other benefits due to Executive hereunder could cause the application of an accelerated or additional tax under Section 409A of the Code, such payments or other benefits shall be deferred if deferral will make such payment or other benefits compliant under Section 409A of the Code, or otherwise such payment or other benefits shall be restructured, to the extent possible, in a manner, determined by the Board, that does not cause such an accelerated or additional tax.

   g.   Successors; Binding Agreement. This Agreement shall inure to the benefit of and be binding upon personal or legal representatives, executors, administrators, successors, heirs, distributees, devisees and legatees.

   h.   Notice. For the purpose of this Agreement, notices and all other communications provided for in the Agreement shall be in writing and shall be deemed to have been duly given when delivered by hand or overnight courier or three days after it has been mailed by United States registered mail, return receipt requested, postage prepaid, addressed to the respective addresses set forth below in this Agreement, or to such other address as either party may have furnished to the other in writing in accordance herewith, including by e-mail, except that notice of change of address shall be effective only upon receipt.

   If to the Company:

   Stuart Dean Co., Inc.
   450 Seventh Avenue, 38th Floor
   New York, NY 10123

   Attention:   Chairman of the Board [add email]

If to Executive:

To the most recent address of Executive set forth in the personnel records of the Company.

     i.   <u>Prior Agreements</u>.  This Agreement supersedes all prior agreements and understandings (including verbal agreements) between Executive and the Company and/or its affiliates regarding the terms and conditions of Executive's employment with the Company and/or its affiliates.

     j.   <u>Cooperation</u>.  Executive shall provide Executive's reasonable cooperation in connection with any action or proceeding (or any appeal from any action or proceeding), which relates to events occurring during Executive's employment hereunder.  This provision shall survive any termination of this Agreement.

     k.   <u>Withholding Taxes</u>.  The Company may withhold from any amounts payable under this Agreement such federal, state and local taxes as may be required to be withheld pursuant to any applicable law or regulation.

     l.   <u>Counterparts</u>.  This Agreement may be signed in counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.  This Agreement may also be executed by facsimile or electronic signature.

     IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

STUART DEAN CO., INC.

By: Michael Degan
    Chairman of the Board

BRUCE HALLETT

14

## Exhibit A

The Stuart Dean Compensation & Benefits Committee recommended and the Stuart Dean Board of Directors approved the following annual CEO incentive plan structure for 2018. It is the Committee's intention that all targets and thresholds of this plan will be evaluated, and adjusted accordingly, on an annual basis.

- **Current CEO Annual Base Salary:**    $425,000

- **CEO Annual Bonus Target:**    $175,000

- **Total Potential 2018 Compensation:**    $600,000

The annual incentive will be calculated based on the following criteria and consist of three (3) components: Profitability, Operating Revenue Growth & Board Directed Strategic Goals. Abnormal non-recurring income or expense items are to be removed from the calculation.

- **Profitability**: (50% or up to $87,500 of bonus) Incentive payout will begin at 2017 year end net income result plus $250,000.

    For the sake of example, using a $1,100,000 profitability result for 2017, the minimum threshold for 2018 would be set at ~$1,350,000. Bonus would be calculated as follows:
    - $0 bonus to be earned for operating company net income less than $1,350,000.
    - 25% of potential bonus allocation ($21,875) to be earned if operating company net income between $1,350,000 & $1,733,333
    - 50% of potential bonus allocation ($43,750) to be earned if operating company net income between $1,733,333 & $2,116,666
    - 75% of potential bonus allocation ($65,625) to be earned if operating company net income between $2,116,666 & $2,499,999
    - 100% bonus allocation ($87,500) for operating company net income equal to $2,500,000 or higher.

- **Operating Revenue Growth**: (25% or up to $42,500 of bonus) $0 bonus for operating revenue growth equal to or less than $3,000,000. 100% bonus for operating revenue growth equal to $5,000,000. Fraction of bonus earned would be equal to the following formula:
    - ((Net Sales Increase YOY-$3.0M)/($5.0M-$3.0M)) x (0.3 x $175K) = Amount Earned

- **Board Directed Strategic Goals** (25% or up to $42,500 of bonus)
    - The board Directed strategic Objectives will be established at the first board meeting in 2018



**GENERATIONS OF EXCELLENCE**
Board of Directors
450 Seventh Avenue, 38th Floor
New York, New York 10123

March 8, 2020

**BY E-MAIL [bhallett@stuartdean.com, ebhallett@gmail.com, ]**

Bruce Hallett
323 West 84th St.,
NY, NY 10024

> Re: Notice of Termination Pursuant to Section 10
> of the Employment Agreement Between
> Bruce Hallet and Stuart Dean Co., Inc.

Dear Bruce:

Please be advised that your employment as the Chief Executive Officer & President of Stuart Dean Co., Inc. (the "Company") is terminated as of today, March 8, 2020, pursuant to Section 10 of the Employment Agreement, dated March 2018, between you and the Company (the "Employment Agreement"). If the Company determines that there is no cause for your termination pursuant to Section 10 of the Employment Agreement, you will be provided with a Separation Agreement and General Release pursuant thereto.

Your termination is effective immediately, and accordingly, you should not report to work tomorrow, March 9, 2020. As a reminder, your post-employment obligations under the Employment Agreement, including the Non-Competition and Confidentiality provisions in Sections 11 and 12, remain in full force and effect and will survive your termination. For your convenience, a copy of your Employment Agreement is attached.

Very truly yours

STUART DEAN CO., INC.

By: _____
Timothy Shea, Chairman
Board of Directors

Acknowledged and Agreed:

_____
Bruce Hallet
Dated: _____



GENERATIONS OF EXCELLENCE

Timothy Shea
Board Chairman

March 13, 2020

Dear Bruce:

Please allow this communication to confirm that, pursuant to Section 10 of your Employment Agreement dated March 2018 (the "Employment Agreement"), your employment with Stuart Dean will end effective March 8, 2020. The Company believes that you have engaged in acts of willful misconduct in connection with your duties as CEO as it relates to unapproved and prohibited negotiations with a potential business partner thereby warranting termination under Section 10(a)(ii)(D). That being said, the Company [will] [is willing] to construe your termination as without cause under Section 10, Subsection C [if you sign an Agreement and General Release].

Accordingly, any participation or coverage to which you may have been entitled under the Company's benefit plans or other benefits outlined in your Employment Agreement, expire on March 9, 2020, except your health insurance will expire on March 8. That being said, provided you timely elect COBRA continuation, the Company will provide to you the payment or reimbursement of health insurance premiums under Cobra for up to twelve (12) months in accordance with Section10.c.(iii)(C) of the Employment Agreement.

Information concerning the conversion or continuation of group health benefits will be forwarded to your attention at the above address.

Lastly, we would like to take this opportunity to remind you about your continuing obligations under Sections 11 and 12 of the Employment Agreement.

If you have any questions, please do not hesitate to me.

Very truly yours,

Tim Shea
Chairman, Stuart Dean

MAIN 212.273.6900  TOLL-FREE 800.322.3180

FAX 212.273.0844  WEB www.stuartdean.com

450 Seventh Avenue  Floor 38  New York, NY 10123

JS 44C/SDNY
REV. 06/01/17

CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for use of the Clerk of Court for the purpose of initiating the civil docket sheet.

PLAINTIFFS
BRUCE HALLETT,

DEFENDANTS
STUART DEAN CO., INC., ADRIENE BAILEY, individually, THOMAS BROWN, individually, MARGARET CULLEN, individually, SCOTT DAY, individually, CHRIS DEGAN, individually, CATHLEEN DEGAN-NIKAS, individually, SCOTT HALSTEAD, individually, TIMOTHY SHEA, individually, and KRISTEN SCHORP, individually,

ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER
Tracy A. Warren, Esq. | Buchalter, APC
(Pro Hac Vice Forthcoming)
655 W. Broadway, Suite 1625, San Diego, CA 92101
Tel.: (619) 219-5335

Lauren M. Paxton
Calcagni Kanefsky LLP
85 Broad Street, Suite 17031, NY, NY 10004
Tel.: (862) 397-1796

ATTORNEYS (IF KNOWN)

CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE)
(DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

28 USC 1332, federal diversity jurisdiction as the plaintiff, who was wrongfully terminated and retaliated against in breach of an agreement as well as in tort, is a citizen of the state of Vermont. His former employer Stuart Dean, has its principal place of business in New York city, NY. Stuart Dean also intentionally and negligently misrepresented plaintiff's compensation and termination.

Judge Previously Assigned

Has this action, case, or proceeding, or one essentially the same been previously filed in SDNY at any time? No [x] Yes [ ]

If yes, was this case Vol. [ ] Invol. [ ] Dismissed. No [ ] Yes [ ] If yes, give date _____ & Case No. _____

IS THIS AN INTERNATIONAL ARBITRATION CASE?    No [x]    Yes [ ]

(PLACE AN [x] IN ONE BOX ONLY)                    NATURE OF SUIT

| TORTS | | ACTIONS UNDER STATUTES |
| --- | --- | --- |

| CONTRACT | PERSONAL INJURY | PERSONAL INJURY/ | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
| --- | --- | --- | --- | --- | --- |
| [ ] 110  INSURANCE | [ ] 310 AIRPLANE | [ ] 367 HEALTHCARE/ | [ ] 625 DRUG RELATED | [ ] 422 APPEAL | [ ] 375 FALSE CLAIMS |
| [ ] 120  MARINE | [ ] 315 AIRPLANE PRODUCT | PHARMACEUTICAL PERSONAL | SEIZURE OF PROPERTY | 28 USC 158 | [ ] 376 QUI TAM |
| [ ] 130  MILLER ACT | LIABILITY | INJURY/PRODUCT LIABILITY | 21 USC 881 | [ ] 423 WITHDRAWAL | [ ] 400 STATE |
| [ ] 140  NEGOTIABLE | [ ] 320 ASSAULT, LIBEL & | [ ] 365 PERSONAL INJURY | [ ] 690 OTHER | 28 USC 157 | REAPPORTIONMENT |
| INSTRUMENT | SLANDER | PRODUCT LIABILITY | | | [ ] 410 ANTITRUST |
| [ ] 150  RECOVERY OF | [ ] 330 FEDERAL | [ ] 368 ASBESTOS PERSONAL | | | [ ] 430 BANKS & BANKING |
| OVERPAYMENT & | EMPLOYERS' | INJURY PRODUCT | PROPERTY RIGHTS | | [ ] 450 COMMERCE |
| ENFORCEMENT | LIABILITY | LIABILITY | [ ] 820 COPYRIGHTS | | [ ] 460 DEPORTATION |
| OF JUDGMENT | [ ] 340 MARINE | | [ ] 830 PATENT | | [ ] 470 RACKETEER INFLU- |
| [ ] 151  MEDICARE ACT | [ ] 345 MARINE PRODUCT | PERSONAL PROPERTY | [ ] 835 PATENT-ABBREVIATED NEW DRUG APPLICATION | | ENCED & CORRUPT |
| [ ] 152  RECOVERY OF | LIABILITY | [ ] 370 OTHER FRAUD | [ ] 840 TRADEMARK | | ORGANIZATION ACT |
| DEFAULTED | [ ] 350 MOTOR VEHICLE | [ ] 371 TRUTH IN LENDING | | | (RICO) |
| STUDENT LOANS | [ ] 355 MOTOR VEHICLE | | | SOCIAL SECURITY | [ ] 480 CONSUMER CREDIT |
| (EXCL VETERANS) | PRODUCT LIABILITY | | LABOR | [ ] 861 HIA (1395ff) | [ ] 490 CABLE/SATELLITE TV |
| [ ] 153  RECOVERY OF | [ ] 360 OTHER PERSONAL | [ ] 380 OTHER PERSONAL | [ ] 710 FAIR LABOR | [ ] 862 BLACK LUNG (923) | |
| OVERPAYMENT | INJURY | PROPERTY DAMAGE | STANDARDS ACT | [ ] 863 DIWC/DIWW (405(g)) | [ ] 850 SECURITIES/ |
| OF VETERAN'S | [ ] 362 PERSONAL INJURY - | [ ] 385 PROPERTY DAMAGE | [ ] 720 LABOR/MGMT | [ ] 864 SSID TITLE XVI | COMMODITIES/ |
| BENEFITS | MED MALPRACTICE | PRODUCT LIABILITY | RELATIONS | [ ] 865 RSI (405(g)) | EXCHANGE |
| [ ] 160  STOCKHOLDERS | | | [ ] 740 RAILWAY LABOR ACT | | |
| SUITS | | PRISONER PETITIONS | [ ] 751 FAMILY MEDICAL | | [ ] 890 OTHER STATUTORY |
| [x] 190  OTHER | | [ ] 463 ALIEN DETAINEE | LEAVE ACT (FMLA) | FEDERAL TAX SUITS | ACTIONS |
| CONTRACT | | [ ] 510 MOTIONS TO | | [ ] 870 TAXES (U.S. Plaintiff or | [ ] 891 AGRICULTURAL ACTS |
| [ ] 195  CONTRACT | | VACATE SENTENCE | [ ] 790 OTHER LABOR | Defendant) | |
| PRODUCT | ACTIONS UNDER STATUTES | 28 USC 2255 | LITIGATION | [ ] 871 IRS-THIRD PARTY | [ ] 893 ENVIRONMENTAL |
| LIABILITY | | [ ] 530 HABEAS CORPUS | [ ] 791 EMPL RET INC | 26 USC 7609 | MATTERS |
| [ ] 196  FRANCHISE | CIVIL RIGHTS | [ ] 535 DEATH PENALTY | SECURITY ACT (ERISA) | | [ ] 895 FREEDOM OF |
| | [ ] 440  OTHER CIVIL RIGHTS | [ ] 540 MANDAMUS & OTHER | | | INFORMATION ACT |
| | (Non-Prisoner) | | IMMIGRATION | | [ ] 896 ARBITRATION |
| REAL PROPERTY | [ ] 441 VOTING | | [ ] 462 NATURALIZATION | | [ ] 899 ADMINISTRATIVE |
| [ ] 210  LAND | [ ] 442 EMPLOYMENT | PRISONER CIVIL RIGHTS | APPLICATION | | PROCEDURE ACT/REVIEW OR |
| CONDEMNATION | [ ] 443 HOUSING/ | [ ] 550 CIVIL RIGHTS | [ ] 465 OTHER IMMIGRATION | | APPEAL OF AGENCY DECISION |
| [ ] 220  FORECLOSURE | ACCOMMODATIONS | [ ] 555 PRISON CONDITION | ACTIONS | | [ ] 950 CONSTITUTIONALITY OF |
| [ ] 230  RENT LEASE & | [ ] 445 AMERICANS WITH | [ ] 560 CIVIL DETAINEE | | | STATE STATUTES |
| EJECTMENT | DISABILITIES - | CONDITIONS OF CONFINEMENT | | | |
| [ ] 240  TORTS TO LAND | EMPLOYMENT | | | | |
| [ ] 245  TORT PRODUCT | [ ] 446  AMERICANS WITH | | | | |
| LIABILITY | DISABILITIES -OTHER | | | | |
| [ ] 290  ALL OTHER | [ ] 448 EDUCATION | | | | |
| REAL PROPERTY | | | | | |

Check if demanded in complaint:

[ ] CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DO YOU CLAIM THIS CASE IS RELATED TO A CIVIL CASE NOW PENDING IN S.D.N.Y.
AS DEFINED BY LOCAL RULE FOR DIVISION OF BUSINESS 13?
IF SO, STATE:

DEMAND $ 3.5 Million    OTHER    JUDGE _____ DOCKET NUMBER_____

Check YES only if demanded in complaint
JURY DEMAND: [x] YES [ ] NO

NOTE: You must also submit at the time of filing the Statement of Relatedness form (Form IH-32).

*(PLACE AN x IN ONE BOX ONLY)*

## ORIGIN

[X] 1 Original Proceeding    [ ] 2 Removed from State Court    [ ] 3 Remanded from Appellate Court    [ ] 4 Reinstated or Reopened    [ ] 5 Transferred from (Specify District)    [ ] 6 Multidistrict Litigation (Transferred)    [ ] 7 Appeal to District Judge from Magistrate Judge

     [ ] a. **all parties represented**

     [ ] b. **At least one party is pro se.**    [ ] 8 Multidistrict Litigation (Direct File)

*(PLACE AN x IN ONE BOX ONLY)*      **BASIS OF JURISDICTION**      *IF DIVERSITY, INDICATE CITIZENSHIP BELOW.*

[ ] 1 U.S. PLAINTIFF    [ ] 2 U.S. DEFENDANT    [ ] 3 FEDERAL QUESTION (U.S. NOT A PARTY)    [X] 4 DIVERSITY

## CITIZENSHIP OF PRINCIPAL PARTIES (FOR DIVERSITY CASES ONLY)

(Place an [X] in one box for Plaintiff and one box for Defendant)

| | PTF | DEF | | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|---|---|---|
| CITIZEN OF THIS STATE | [ ] 1 | [X] 1 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | [ ] 3 | [ ] 3 | INCORPORATED and PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE | [ ] 5 | [ ] 5 |
| CITIZEN OF ANOTHER STATE | [X] 2 | [ ] 2 | INCORPORATED or PRINCIPAL PLACE OF BUSINESS IN THIS STATE | [ ] 4 | [ ] 4 | FOREIGN NATION | [ ] 6 | [ ] 6 |

PLAINTIFF(S) ADDRESS(ES) AND COUNTY(IES)

Bruce Hallett
555 Windhall Hollow Road
Bondville, VT 05340

DEFENDANT(S) ADDRESS(ES) AND COUNTY(IES)

Stuart Dean
450 Seventh Avenue, 38th Floor
New York, NY 10123

DEFENDANT(S) ADDRESS UNKNOWN

REPRESENTATION IS HEREBY MADE THAT, AT THIS TIME, I HAVE BEEN UNABLE, WITH REASONABLE DILIGENCE, TO ASCERTAIN THE RESIDENCE ADDRESSES OF THE FOLLOWING DEFENDANTS:

ADRIENE BAILEY, THOMAS BROWN, MARGARET CULLEN, individually, SCOTT DAY, CHRIS DEGAN, CATHLEEN DEGAN-NIKAS, SCOTT HALSTEAD, TIMOTHY SHEA, and KRISTEN SCHORP.

## COURTHOUSE ASSIGNMENT

I hereby certify that this case should be assigned to the courthouse indicated below pursuant to Local Rule for Division of Business 18, 20 or 21.

Check one:    THIS ACTION SHOULD BE ASSIGNED TO:    [ ] WHITE PLAINS    [X] MANHATTAN

DATE May 19, 2020    SIGNATURE OF ATTORNEY OF RECORD    ADMITTED TO PRACTICE IN THIS DISTRICT
[ ] NO
[ ] YES (DATE ADMITTED Mo. _____ Yr. _____)
RECEIPT #    Attorney Bar Code #

Magistrate Judge is to be designated by the Clerk of the Court.

Magistrate Judge _____ is so Designated.

Ruby J. Krajick, Clerk of Court by _____ Deputy Clerk, DATED _____.

UNITED STATES DISTRICT COURT (NEW YORK SOUTHERN)

[ Clear Form ]    [ Save ]    [ Print ]

HALLETT v. Stuart Dean Co., Inc et al, Docket No. 1_20-cv-03881 (S.D.N.Y. May 19, 2020), Court Docket

# General Information

| | |
|---|---|
| **Court** | United States District Court for the Southern District of New York; United States District Court for the Southern District of New York |
| **Federal Nature of Suit** | Contract - Other[190] |
| **Docket Number** | 1:20-cv-03881 |

Bloomberg Law®

© 2020 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Services